May it please the Court, my name is Joseph M. Alioto and I represent the appellant, Golden Gate Pharmacy Services. This case is brought to the Court on the basis of Section 16 of the Clayton Act, charging a violation of Section 7 of the Clayton Act. The principal issue as we see it is that the Court below failed to follow the binding decisions by the Supreme Court of the United States in viewing the relevant market. The relevant market is not obviously the end result of what we're looking for under a violation of Section 7. Nonetheless, it seems to be a very prominent role in analysis. And our view of it is that the Supreme Court was very clear that the relevant market cannot be bisected into such a small area that it has and loses its significance. Our view is very simple, that in the pharmaceutical business there's no doubt that there is such a thing as the pharmaceutical business and industry, that the defendant itself recognizes it as such, that by reason of this merger it claimed that it was and it is the largest merger in the history of the United States. It was over $60 billion. The defendant himself considered that by reason of the merger that they now became or cemented were their words number one in the pharmaceutical industry in the United States. But bigness itself, of course, is not an antitrust violation. Bigness itself is not, of course, an antitrust violation. However, generally speaking, if you can see from the Supreme Court decisions, the encouragement is that that be an internal growth. Because when it becomes external and it's by merger, and especially in a concentrated industry as this one certainly is, then you have all of the anti-competitive effects. The prices rise. Jobs are lost. Innovation goes down the tubes. And as we pointed out, even in this case, after this was approved, they fired something like 20,000 people. They shut six R&D plants and subsequently, at least the New York Times, and remember this was on preliminary injunction, the New York Times announced increases. I think this is on 12A6. And well, but it was also for a preliminary injunction. If it's 12B6, then, of course, all of the facts that we have alleged are true. And those facts is what we allege would happen, did happen. And that, in fact, what the court did was tried to say that there was no substitutability between certain specific products. And the district judge gave you repeated occasions to file complaints in which you would allege specific drugs, and you never did. Correct. And we wouldn't want to because that is not what the Supreme Court said. Well, you didn't want to, but that's exactly what the district judge asked you to do. Could you have done it? We could have said, for example, that there is such a thing perhaps as a cholesterol drug by Pfizer and a similar cholesterol drug by Wyeth. However, it's not a case of cholesterol drugs. It's a case of the mammoth combination in the pharmaceutical industry reducing it and concentrating it further to allow them to be able to fix prices across the board and to allow them not to engage in any kind of innovation because they don't have to anymore because that's why they bought it. They substituted it. So as you say, Your Honor, when you're talking about size is not itself a violation, when that size is achieved by what I think Leonard Hand described as honest industrial work, that's one thing. But when you achieve it, when you're large like this, then, as the Supreme Court has said, when you have a large company even buying a smaller company of little market share, what you are talking about is a further concentration contrary to the decisions by the Supreme Court. The Supreme Court, I think, may be ---- Counsel, let me just ask a question here. Most of the cases you cited involve products involving cluster markets. Now, here, unlike an industry like banking, a pharmacy does not need to carry one company's full array of products or another. It could carry Pfizer's drug X, Weiss' drug Y for an ailment. Doesn't that make this case different from the cluster cases? I do not believe, first of all, if it pleases Your Honor, I do not believe that those cases can be described simply as cluster cases. Certainly cluster was used in one of them. In answer directly to your question, I don't believe that that is correct either because a pharmacy tries to have a broad range of products that would be available for their customers so they would have the broad range. They would have the cholesterol. They would have the drugs for other pains. They would have the drugs for other uses. That's the way the pharmacy works. They are the retail outlet. They are directly impacted by this. So when you have a combination like this, especially as large as it is, then what you are doing is you are inviting higher prices for sure, which happened. You are inviting lack of research and development, which is so important. When they shut down their six plants, the reason that they did that is because there was no need to have innovation, which, of course, goes directly to the consumers and to the pharmacists. And in addition, of course, as Supreme Court noted in Brown-Shue, if you develop internally by size, you are creating jobs and you are actually pursuing innovation. But when you do it by merger, it is exactly the opposite. You have to cut the jobs off and the innovation is shut down because you don't need it anymore. You bought your competitor out. And, of course, the prices rise because there is no competition. So what was said, for instance, in the HCA case that said specifically, these may be old cases, the Supreme Court cases, but they are not overruled and we are still governed by them. Judge Posner said so. And the description is simple enough. If you have a non-trivial transaction and that transaction grabs a significant rival, especially in an industry where there is concentration as there is in this industry, then you must have a violation of Section 7 because Section 7 is supposed to stop the Sermon Act type of violations in the incipiency. That's why they say may substantially lessen competition. And the markets have to be viewed the way they view it, and that's the way they viewed it. In their own stockholder reports, they don't do, say, cluster, for example. They are proud to say that by getting Wyeth, we can shut down these plants and we're now cemented our position as being number one in the industry, not only in the United States but throughout the world. I have two minutes which I would like to reserve for rebuttal if it pleases the Court. Fine.  Thank you, Your Honor. Thank you. Good morning, Your Honors. May it please the Court. My name is Thomas Peterson. I represent the Appleese in this case. What's before you today is a situation where you're dealing with an FDA-approved merger that was consummated 19 months ago, and there is a claim that somehow you should revitalize what is essentially a divestiture of the company. based upon an unsustainable theory of product market definition that the plaintiff deliberately clung to, that is, pharmaceuticals as a generic category, notwithstanding repeated opportunities given to him by Judge Chesney to plead something which meets the requirements of the law. And those requirements, I think, are well embodied at the very outset of the argument in Plaintiff's opening brief where they quote the leading Supreme Court case of those older cases on how you define product markets, the Cellophane case, which says that commodities reasonably interchangeable by consumers for the same purpose are what you use to determine the scope of a product market. And how would you distinguish the Brown-Shue case? Your Honor, the Brown-Shue case is a case where the relevant market that was being analyzed by the Supreme Court was the market for children's shoes, women's shoes, men's shoes, because there was a reasonable interchangeability as to those shoes. Now, there was also some discussion of the broader shoe market, but the Supreme Court specifically says to the argument that it shouldn't differentiate into these subcategories where the actual competition takes place, the Supreme Court says it doesn't matter in our case because the percentages of the market controlled by the merging entities were the same. So it really is an analysis that's being conducted at the segment of the market where consumers have to make choice. And that, by the way, is how this court interpreted that decision in the Kodak case. So you not only have how Brown-Shue I think is fairly read,  And that's because this court itself has repeatedly explained what we are to make of that Supreme Court precedent that Mr. Aliota was referring to. And it is things like if consumers view the products as substitutes, the products are part of the same market. That's this court's decision in the Rebel Oil case. Or in the NewCal case, this court writes, again, judging a case on the pleadings, the inquiry into the commercial realities faced by consumers is what you look to in order to determine how you define the market in this case. And with respect to judgment on the pleadings, this court has said that if it is an unsustainable theory, judgment on the pleadings can be granted as to product market definition. This court has also said if the assumed facts suggest an unreasonable market within the construct of the law, you grant judgment in that kind of a case. And, of course, we also have the pleading standards from the Supreme Court in Twombly and Iqbal that say if you simply have a conclusory complaint that asks you to draw implausible assumptions, here that all pharmaceuticals are essentially interchangeable to consumers, then that's a case where you grant judgment on the pleadings. And here, if you think about where would you be taken in this case if you entertain the suggestion of plaintiff's counsel about how you would define a market in this case. Let's just take a hypothetical. Suppose you had two very large pharmaceutical companies in terms of size who were determined to have complementary product lines, the product lines that were not competitive, which, by the way, is what the FTC determined when it approved this merger. That would be a case where you'd subject it to antitrust scrutiny. But on the other hand, under plaintiff's theory, if you had two small companies which totally controlled the therapeutic pharmacy products available for a particular product such that the products were in direct competition, you wouldn't subject that to any antitrust scrutiny. Well, you know, I'm not sure I'm saying anything that will help the plaintiff, but he doesn't exclude that. He merely says he doesn't need to show that. But, yes, well, I understand that, but my point is that, again, he's got to show, he's got to plead a competitive market within that set of standards at some level, I think, Your Honor, and I don't think he's going to. But what you were saying was he would concede that the two small companies who are directly competitive in their drug lines don't violate antitrust by merging. I do not think he would concede that at all. No, I'm sorry. I didn't mean to suggest he would concede it. What I was trying to suggest was that if you were to write a decision that says that is the relevant frame of reference for analyzing the market, I think you'd potentially create serious questions about other cases where there really would be serious anti-competitive effect. I think we would be fully capable of writing an opinion to say there are two ways to violate the statute. One of them is this case, and the other one is the two small companies merging with competitive product lines. We could manage that. Okay. But I'm going to try to encourage you not to do the first. Not to do the first one. Let me just respond to a couple of points that counsel made. First, he talks about the question of how industry recognizes the market. Yes, that is one of a multitude of factors which is listed in the Brown-Schuh case, all of which have been interpreted and are subordinate to the inquiry about consumer choice and cross-elasticity of demand. And Brown-Schuh underscores the importance of some of those other factors by talking about things like whether there's distinct customers who are attracted to the product, whether there's a sensitivity to price changes as among the particular products. So, again, the fact that the industry uses a terminology market very often in a different sense, that is not to reflect the requirements of antitrust law, isn't probative here of what you have to find for purposes of having a valid complaint in this case. With respect to whether or not jobs have been lost, the point here, let's go back to Section 7. What is Section 7 aimed at? Section 7 by its terms requires you to define a line of commerce, and then it requires you to assess whether there has been the probability of competitive injury in such a line of commerce if this acquisition takes place. That is the relevant inquiry for purposes of this statute, and that inquiry is what you have to conduct in order to determine whether or not there are anti-competitive consequences, which are then focused on consumers and consumer welfare, and labor law rights and so on are dealt with by other areas of our law. I'd like to comment, or respond rather, to Judge Nelson's question about the cluster market cases from the Supreme Court. Many of the cases which have been discussed in the plaintiff's brief as supposedly indicative of broad markets where consumers don't necessarily interchange particular products are cluster market cases because they are cases like Philadelphia National Bank, where a consumer views the commercial bank as offering a full line of services and thus is in competition with other commercial banks. Those cases simply take the issue of product examination and view it as to a line of products, and here we don't have any kind of an allegation that the line of products that is offered by Pfizer is in competition with the line of products which is offered by Wyeth, which is what you would need in order to satisfy the requirement of those cluster market cases, and it does in fact distinguish them from this case. Now, insofar as the plaintiff suggests that pharmacies want a line of products, the point is that he'd have to allege that there were competitive lines offered by these two merging companies, and he hasn't attempted to do that. Let me speak to the question of research and development. The allegation in this case is that there are innovation pharmacy markets. That is just another variation of his repeated theme that he can allege a pharmacy product market or a branded pharmacy market, and thus as Judge Chesney recognized, you've got to conduct an analysis again of whether or not there are competitive interchangeable constraints with respect to where that research and development is going to be directed in order to decide if there are anti-competitive effects under Section 7 of the Clayton Act. That inquiry is what you would have to conduct in this kind of case. Now, let's look at the only authority he cited to you with respect to this innovation research and development theory. One is a consent decree case, which involves a situation where the auto industry was trying to quash pollution devices to put onto cars, so again, it's a targeted research issue. The other is simply a complaint the FTC filed where the research and development in the drug industry was aimed at a particular product. There are important policy reasons why it is that the pleading standards of a sustainable theory, a not unreasonable theory, should be upheld. They've been articulated by the Supreme Court in the Twombly case, which recognizes the enormous stakes involved in cases like this, and by this court in the Kendall case where the court recognized that very often lawsuits that are brought with inadequate allegations in them are simply a device to, in this court's words, extort settlements in cases where they're really not deserving. Here we have a case that was brought long after this merger was announced, an 11th hour effort to get a TRO, the transaction has been consummated, and there's ample protection under the antitrust law, Section 2 and other remedies. If there really is any consequence of this that's anti-competitive, but I suggest to you that it is appropriate that you should affirm Judge Chesney's judgment in this case, which is perfectly sound. Okay, thank you very much. Mr. Aliotto, I think you have saved some time. Thank you, Your Honor. May it please the Court, I believe that I have about two minutes and 50 seconds or so. Thank you. First of all, in answer, Your Honor, to the Court's question with regard to Brown's shoe, there's no way that counsel, distinguished as he is, could possibly line up his situation with Brown's shoe. In Brown's shoe, as the Court may remember, the first division was for men, women, and children's shoes. The argument was it had to be even lower than that. It had to be by price and by quality. The Supreme Court rejected that at page 152 of the Supreme Court Reporter of 82. And in addition to that, it was argued you can't say that a young girl's pump shoes, as they said, is interchangeable with a young boy's shoes or an older boy's shoes. And the Court rejected that as well. At page 1524, they said, quote, the boundaries of the relevant market must be drawn with sufficient breadth to include the competing products of each of the merging companies to recognize competition where, in fact, competition exists. Thus, we agree with the district court that in this case, a further division of product lines based on price quality differences would be unrealistic. They also said the same thing with regard to the different shoes. Grinnell is another case. But you have failed to allege any drugs in which there is direct competition or substitutability. Direct competition and substitutability, Your Honor, in these Supreme Court decisions we would respectfully submit is not simply whether or not you could use one product with another. And just as I just read, if the price changes on one, will they move to another? But Judge Chesney is very clear. Her examples are perhaps a little far-fetched in order to illustrate the point clearly. But she says, if she goes along with your theory, the price, I'm just quoting her from her order, the price Wyeth charged for a product intended to use depression has some type of effect on a price charged for Pfizer for products intended to treat renal cell carcinoma. I mean, you've got to allege something. Okay, this drug by Pfizer, this drug by Wyeth, they are usable by the consumer for roughly the same purpose and there is some substitutability between the two. You have made no such allegation. The cases are contrary to that concept, Your Honor. If you take Grinnell, for instance, you have a fire alarm and you have a burglar alarm. Obviously, they're not interchangeable. The Supreme Court said, yes, they are. They both protect the house. In Brown-Shue, it's exactly the same thing. In Pabst, it's exactly the same thing. They are not identically substitutable. Okay, got it. Thank you very much, Your Honor. Thank you very much. The case of Golden Gate Pharmacy Services v. Pfizer, et al., now submitted for decision.
judges: Duffy, Nelson D. W., Fletcher W.